UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| v. | § § | |
| JASON PENNEY, | § § | CRIMINAL NO. 24-CR-074-RP |
| Defendant. | § § § § | |

**GOVERNMENT'S SENTENCING MEMORANDUM
REGARDING JASON PENNEY**

The Government respectfully submits this sentencing memorandum regarding the sentencing of Defendant Jason Penney. Defendant pled guilty to one count of Conspiracy to Commit Wire Fraud due to his participation in a conspiracy that obtained over $15 million in fraudulent loans. The Government respectfully requests a significant prison sentence that reflects the serious nature and circumstances of the offense and sends a message that fraud will result in serious consequences.

**I.   BACKGROUND**

On April 8, 2024, an Information was filed charging Mr. Penney with one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1349 and 1343. On April 30, 2024, Mr. Penney pled guilty to the Information. On February 20, 2024, prior to the filing of the Information and Mr. Penney's guilty plea, the Government charged one of Mr. Penney's coconspirators, David Kalderon, in a one-count Indictment with the same crime but under a different case number. Mr. Kalderon has since pled guilty and is awaiting sentencing.

On April 23, 2019, the FBI initiated an investigation into the activities of Jason Penney. From at least 2014 through December 15, 2022, Mr. Penney and his coconspirators, including

David Kalderon, conducted a scheme to defraud computer hardware financing companies, which provide financing for businesses to purchase computer hardware, by providing false invoices, contracts, and kickbacks to the individuals and/or businesses signing the lease agreements. Mr. Penney and coconspirators then utilized various businesses entities to receive and launder the proceeds from the fraud scheme.

The investigation was initiated based upon information provided by Victim 1, a company that finances the purchase of computer hardware, to the FBI. Officials from Victim 1 stated that they were the victim of a multi-million-dollar scam perpetrated by a company called Computers by Design (CbD). Victim 1 is located in the Austin Division of the Western District of Texas.

Victim 1 finances consumer purchases through revolving credit accounts and leases. Victim 1 utilizes approved partners, which are third party companies that sell computer products and services. The partners locate and sell equipment to end user customers and approach Victim 1 to finance the purchase. If Victim 1 agrees to finance the purchase, the partner will send VICTIM 1 an invoice for the equipment they are selling. Victim 1 will then pay the partner by wire transfer. Typically, Victim 1 finances the equipment to the end user customer for a period of 3 to 5 years. These transactions were also referred to and structured as leases of the computer equipment, similarly financed by Victim 1.

On January 30, 2018, CbD, became an approved Victim 1 partner and began bringing customers to Victim 1. Victim 1 has approved approximately $6.5 million in purchases through CbD. Typically, the invoices submitted to Victim 1 were for one piece of computer equipment and CbD would bill for the full amount of the credit limit approved by Victim 1.

In approximately March of 2019, Victim 1 discovered an issue with the lease agreements endorsed by CbD after a Victim 1 sales representative noticed that one of the end user customers,

Witness 1, had only used $150,000 of their available $200,000 line of credit. A Victim 1 representative called Witness 1 and informed him/her that Witness 1 still had credit available. Witness 1 then informed the sales representative that he/she was not interested in more equipment and had simply been in the market for a business loan when Witness 1 agreed to the line of credit. Victim 1 then began contacting many of CbD's customers, who reported similar stories and reported they were looking for a business loan and not computer equipment. Victim 1 was informed by the end user customers that they were desperate for cash.

Victim 1 learned that CbD was informing end user customers that if they purchased equipment through their company they would qualify for a "rebate" loan, which was typically equal to 50% of the lease amount. This "rebate" worked in the following manner: after the lease agreement was signed between the end user customer and Victim 1, CbD would submit an invoice for the equipment the end user customer was purchasing/leasing and VICTIM 1, who would make payment directly to CbD. Once the payment was received, CbD would transfer the agreed upon "rebate" to the end user customer (typically 50% of the total loan amount). Victim 1 was not aware of the "rebate" loans brokered by CbD and, according to the partner agreement signed by Victim 1 and CbD, rebates of proceeds paid by Victim 1 to the partner were expressly prohibited unless approved by Victim 1. Victim 1 did not approve any of the "rebate" loans received by end user customers.

Furthermore, Victim 1 learned that CbD was providing customers with cheap, outdated, and refurbished equipment that was not what Victim 1 agreed to finance or lease. The partner agreements signed by CbD and Victim 1 state that the partner was to provide newly manufactured equipment in original packaging. In several instances, Victim 1 received pictures of computer equipment purchased by end user customers from CbD and it did not match what was stated in the

lease agreements or invoices submitted to Victim 1. Furthermore, the conspiracy coached their customers on what to say should Victim 1 make inquiries about the equipment.

Through a lengthy investigation, FBI ultimately determined that CbD was owned and operated by Mr. Penney. Mr. Penney hid his identity and control of CbD and other companies by using assumed names and by using a straw person, Mr. Penney's wife's stepmother, to open company bank accounts and P.O boxes. Mr. Penney also used companies called Computer Wrestlers LLC and PCPC Direct.

FBI received documentation of the finance/lease agreements between Victim 1 and CbD. FBI also obtained bank records that confirmed payments made by Victim 1 to CbD and the "rebate" payments sent from CbD to the borrowers. The records also showed that in most or all cases 20% of the payments would be wired to other companies, which included a company controlled by Kalderon. The investigation revealed that various persons were marketing "rebate" loans online and on social media. These people, referred to as "brokers" or "middlemen," would locate and identify potential customers, most often struggling small businesses that needed an immediate infusion of cash. Once identified, the brokers would bring the customers to Mr. Penney, who as an approved partner with the lender had the established relationship and would help set up the fraudulent financing/lease. The brokers in return were generally paid 20% of the amount obtained fraudulently.

The conspiracy's false, fraudulent, and misleading statements and omissions to the victim lenders included, but were not limited to:

    a.    The conspiracy omitted the fact that the borrowers had been told and believed these were "rebate" loans;

b. The conspiracy omitted the fact that they were receiving half of the amount distributed as financing;

c. The conspiracy misrepresented that the only payment they would be receiving as part of the transaction was the fee authorized by the financing program;

d. The conspiracy misrepresented the IT equipment being obtained by the businesses with the financing; and,

e. The conspiracy misrepresented the value of the IT equipment being obtained by the businesses with the financing.

Mr. Penney would receive payments from the victims via wire transfer and would use wire transfers to transfer the funds to the businesses and to the brokers. The financing/lease applications were submitted to the victims via the internet, and phones and the internet were also used to solicit and communicate with the businesses seeking the "rebate" loans. Accordingly, for the purpose of executing the scheme and artifice, members of the conspiracy transmitted and caused to be transmitted by means of wire communication in interstate commerce those writings, signs, signals, pictures, and sounds.

Funds received by CbD and Computer Wrestlers were tied directly to Mr. Penney. $231,679.35 from Computer Wrestlers, LLC's BB&T account ending in #5392 were used as the down payment to purchase Mr. Penney's primary residence at the time, a multi-million dollar property in Ormond Beach, Florida. Funds from that account were also used to make approximately $590,000 in mortgage payments for the Ormond Beach property from September 2018 thru June 2019.

Fraud funds were also used to purchase several vehicles, including a Maserati and a Cadillac Escalade. Neither Mr. Penney nor his spouse had any legitimate employment during the

relevant time, so all of their purchases and expenditures were done with illegally obtained funds. Neither Mr. Penney nor his wife filed any tax returns from 2008 through 2019.

Further investigation showed that Mr. Penney was conducting this same scheme with other lenders similar to Victim 1.

In total the investigation showed that the conspiracy fraudulently obtained over **$15 million**. After subtracting the amounts paid to the customers and the brokers, Mr. Penney personally received in total approximately **$4.5 million**.

## II.   A SIGNIFICANT PRISON SENTENCE IS APPROPRIATE IN THIS CASE

Defendant was a critical player in a sophisticated conspiracy executed to take advantage of financing companies and carried out for several years. A significant sentence would meet the goals of § 3553(a) by addressing the nature and circumstances of the offense and deterring future criminal conduct by others.

Mr. Penney clearly knew what he was doing was illegal. He used assumed names and hid his ownership and control of the businesses through which he conducted his scheme by using a family member to open bank accounts and establish P.O. boxes. When one victim would catch on to his scheme, as Victim 1 did, he would simply move on to another. Mr. Penney enjoyed the fruits of his scheme – he purchased and lived in a multi-million dollar house, purchased luxury cars (using fraudulent loan applications), and sent his children to expensive private schools. He knew he was obtaining millions of dollars based on false and fraudulent representations, and the only thing that stopped him was the FBI investigation.

The Court should reject Mr. Penney's request for a non-custodial sentence or a significant variance or departure from the Guidelines. A non-custodial sentence will be seen as a slap on the wrist, a minor inconvenience in exchange for profiting from millions of dollars in fraud.

Significant leniency will do nothing to deter others from criminal activity and will instead show the public that the justice system is not willing to severe impose costs upon fraudsters. A non-custodial sentence would represent a significant sentencing disparity compared with other fraudsters who have recently been sentenced in the Austin Division of the Western District of Texas, many for schemes that had much lower intended or actual loss amounts.

However, Mr. Penney has admitted his criminal activities and accepted responsibility for his actions. And he did so almost immediately upon learning of the FBI's investigation, as detailed in the Government's sealed memorandum.

A significant prison sentence is necessary and appropriate to punish Defendant for his actions and to send a strong message to others who might be similarly tempted that such conduct will not be tolerated. Mr. Penney benefitted from his clearly illegal actions to the tune of millions of dollars amassed over several years and lived a life of luxury due solely to that scheme. The bill has now come due.

### III. CONCLUSION

Defendant was a critical member of a conspiracy that obtained millions of dollars through fraud. A significant prison sentence is reasonable, appropriate, and necessary in this case.

Respectfully submitted,

MARGARET F. LEACHMAN
Acting United States Attorney


By:   */s/ Keith M. Henneke*
      KEITH M. HENNEKE
      Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Government's Sentencing Memorandum Regarding Jason Penney has been delivered via the CM/ECF automatic notification on this the 22nd day of April 2025 to defense counsel.

*/s/ Keith M. Henneke*
KEITH M. HENNEKE
Assistant United States Attorney